
RECEIVED
IN MONROE, LA
MAY 1 6 2008
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

DAWSON FARMS, LLC          CIVIL ACTION NO. 06-0737

VERSUS          JUDGE ROBERT G. JAMES

BASF CORP., ET AL.          MAG. JUDGE KAREN L. HAYES

### RULING

Before the Court is Defendant BASF Corporation's ("BASF") Motion for Summary Judgment [Doc. No. 121].

For the reasons stated below, BASF's motion is GRANTED as to Dawson's Negligence, Negligent Misrepresentation, and Louisiana Unfair Trade Practices Act claims, and DENIED as to Dawson's redhibition, breach of warranty, and design defect claims.[1]

## I.    BACKGROUND

Dawson grows sweet potatoes in Delhi, Louisiana. In 2005, BASF began marketing the herbicide Outlook to Louisiana sweet potato growers. BASF had previously marketed Outlook as an herbicide to be used on corn, but when the corn market started shrinking, BASF started marketing Outlook to sweet potato growers.

Prior to 2005, Dawson and other Louisiana sweet potato growers often controlled weeds by applying an herbicide called Dual. When BASF started marketing Outlook for use on sweet potatoes in Louisiana, Dual was no longer labeled for use on Louisiana's sweet potatoes.

---

[1] On May 13, 2008, a document entitled "Ruling" was filed in this case. See [Doc. No. 180]. That document was filed in error, see [Doc. No. 181], and does not constitute the decision of the Court and shall not be considered the law of the case.

During the 2005 growing season, Dawson treated its sweet potatoes with Outlook.
Dawson alleges that Outlook caused severe damage to its crops by producing stunted and
malformed sweet potatoes, and claims that damage to sweet potato crops occurred throughout
Louisiana and Mississippi and that the damage from Outlook was more severe than that which
would have been expected with Dual.

After the 2005 growing season, Outlook was no longer marketed for use on sweet
potatoes. According to Dawson, internal studies conducted by BASF prior to the 2005 crop year
portended that Outlook would damage sweet potatoes.

Dawson brought claims against BASF for redhibition, breach of warranty, negligence, and
negligent misrepresentation. Dawson has also alleged that BASF is liable under the Louisiana
Unfair Trade Practices Act ("LUTPA"), La. Rev. Stat. Ann. § 51:1401, et seq, and the Louisiana
Products Liability Act ("LPLA"), La. Rev. Stat. Ann. § 9:2800.51, et seq. BASF has moved for
summary judgment on all claims.

## II.    LAW AND ANALYSIS

### A.    Summary Judgment Standard of Review

Summary judgment is appropriate only when the pleadings, depositions, answers to
interrogatories and admissions on file, together with any affidavits, show there are no genuine
issues as to any material fact and the moving party is entitled to judgment as a matter of law.
Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the
basis for its motion by identifying portions of the record which highlight the absence of genuine
issues of material fact. Topalian v. Ehrmann, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is
"material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under
applicable law in the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A

2

dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. Id.

If the moving party can meet its initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. Norman v. Apache Corp., 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255.

**B.     Negligence, Negligent Misrepresentation, and LUTPA Claims.**

Although Dawson originally raised claims against BASF for negligence and negligent misrepresentation and under the LUTPA, it has conceded that those claims should be dismissed on summary judgment because the claims are preempted by the LPLA and the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, et seq. See [Doc. No. 134-1 at 1]. Therefore, the Court GRANTS BASF's Motion for Summary Judgment on these claims.

**C.     Redhibition Claim**

In its Complaint, Dawson claims BASF is liable under Louisiana Civil Code Article 2520, et. seq., under which a seller implicitly warrants that there are no "redhibitory defects, or vices, in the thing sold." La. Civ. Code art. 2520. "A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had [it] known of the defect." Id. The buyer may rescind the sale when there is a redhibitory defect. Id. A defect is also redhibitory, entitling the buyer to recover quanti minoris damages for a reduction in the purchase price, when, without rendering the product totally useless, the defect diminishes the product's utility or its value so that it must be presumed that a

3

buyer would still have purchased the product but for a lesser price. Jessup v. Ketchings, 482 F.3d 336, 342 (5th Cir. 2007) (citing La. Civ. Code art. 2520).

Defects that were known to the buyer at the time of the sale, or defects that should have been discovered through a simple inspection, are excluded from the seller's legal warranty. Id. (citing La. Civ. Code art. 2521)); Amend v. McCabe, 95-0316 (La. 12/1/95); 664 So.2d 1183, 1188 (La.1995)).

### 1.    Was Outlook defective under Article 2520?

According to Dawson, Outlook is "defective" under Louisiana Civil Code article 2520 because it was not "fit for its ordinary or intended use" as a sweet potato herbicide. See [Doc. No. 134-1 at 14] ("Whether a product is 'defective' is ultimately a determination of whether the product was fit for its ordinary or intended use."); see also [Doc. No. 134-1 at 11, 14]("[t]he abstract possibility of some damage is not the defect. . . . [T]he pertinent issue is whether Outlook performed as a herbicide should have."); ("The problem with Outlook is that it causes injury of greater severity, with greater frequency, and over a wider range of conditions than a commercially acceptable herbicide should.").

Under Article 2520, a seller implicitly warrants that a product is free of redhibitory defects. Under Article 2524 a seller implicitly warrants that the item sold is reasonably fit for its ordinary or intended use. La. Civ. Code art. 2524. A product is not necessarily defective under Article 2520 simply because it is unfit for its intended use under Article 2524. See La. Civ. Code Ann. art. 2524 cmt. b (1993) (expressly recognizing that a product can be unfit for its ordinary use, even though it is free from redhibitory defects).

However, in most instances, a product unfit for its ordinary or intended use under 2524 will also be defective under 2520. George L. Bilbe, Redhibition and Implied Warranties Under

4

the 1993 Revision of the Louisiana Law of Sales, 54 La. L. Rev. 125, 141 (1993) (anticipating

that there will be "relatively few situations" where a product is unfit for ordinary use but not

redhibitory law). The relatively few situations in which a product can be unfit for its ordinary

use, yet free from redhibitory defects do not apply in this case.[2]

In this case, there is a genuine issue of material fact as to whether Outlook was defective

within the meaning of Article 2520. Under Article 2520, a defect is a "physical imperfection or

deformity, a lacking of a necessary component or *level of quality*." Downs, 899 So.2d 792 at 796

(emphasis added) (citing Williams v. Louisiana Mach. Prop., Inc., 387 So.2d 8, 11 (La. App. 3

Cir. 1980)); see also Mire, 927 So.2d at 1118 n.4. Defects in quality are redhibitory only if they

render the product useless, or so inconvenient that it must be presumed that a buyer would not

have purchased the product had it known of the defect. See La. Civ. Code Ann. art. 2520.

Dawson's expert, Dr. Mike Cannon, states in his report that Outlook is more "potent"

than similar herbicides. [Doc. No. 134-8 at p. 29]. Dr. Cannon also testifies in an affidavit that

---

[2] For example, when a product is working as the seller intended, but the product as a whole works differently than the buyer expected, the product is unfit for its intended use, but not necessarily defective. See Mire v. Eatelcorp. Inc., 2004-2603, p. 9, (La. App. 1 Cir. 12/22/05); 927 So.2d 1113, 1118 (company designed cellular telephones with a feature that rendered them inoperable with other service providers). Also, a zoning ordinance that restricts how property can be subdivided does not qualify as a defect under 2520, but may render the property unfit for its intended use. See Downs v. Hammett Prop., Inc., 39,568, p. 5 (La. App. 2 Cir. 4/6/05); 899 So.2d 792, 796. Finally, if a product works for a shorter duration than a buyer would ordinarily expect, the product is unfit for its intended use, but arguably not defective under 2520. See Hob's Refrigeration and Air Conditioning, Inc., 304 So.2d 326 (La. 1974); see also Bilbe 54 La. L. Rev. at 140-141 (according to the author, Hob's Refrigeration arguably suggests the existence of an implied warranty of fitness not covered by redhibition law); Sepulvado v. Time it Lube, Inc., 39,353, p. 2-3 (La. App. 2 Cir. 3/2/05); 895 So.2d 729, 733 (Caraway, J. dissenting), but see Bilbe 54 La. L. Rev. at 140 (noting that "the warranty recognized in [Hob's Refrigeration] can be characterized as one included in [Article 2520]."). In these rare examples, the plaintiff's cause of action is controlled by the law of conventional obligations–not redhibition. See Avondale Indus., 2003 WL 22697180 at * 2 (citing La. Civ. Code. art. 2524).

5

Outlook's adverse effects are unpredictable, e.g., Outlook damages crops over a large geographical area, in a wide variety of growing conditions, and even with low application rates. Id. at pp. 1-3. After reviewing BASF's own product literature, discussing Outlook with BASF's experts, and reviewing the deposition of Dr. David Monks, another BASF expert, Dr. Cannon concluded in his expert report that Outlook has a "super activity" that makes it more likely to be absorbed by broadleaf plant roots. Id. at p. 26. A reasonable juror could find that this characteristic is particularly problematic for sweet potatoes, which are broadleaf plant roots. Under these facts a reasonable juror could also conclude that Outlook's potency, unpredictability, and capacity to be absorbed by broadleaf plant roots are defects under Article 2520.

According to Dawson, even if properly applied, herbicides in Outlook's same chemical family, i.e., chloroacetamides, can damage crops. Chloroacetamides, however, usually do not injure plants unless there has been excessive rain or irrigation, and, when there is excessive rain or irrigation, these herbicides do not usually kill sweet potatoes. Dawson's evidence suggests that, unlike other chloroacetamides, Outlook damages sweet potatoes with or without excess water, and that damage occurs even when farmers apply less product than is recommended by the label. Id. at p. 20-21. Dawson points to a case in which a farmer allegedly applied Outlook to one sweet potato field and a different herbicide to an adjacent sweet potato field; the adjacent field had normal yields, but sweet potatoes sprayed with Outlook were damaged. Id. at p. 19-20. In another case, Outlook allegedly destroyed 100% of a farmer's sweet potatoes. Id. at p. 21. Dawson has presented evidence creating a genuine issue of material fact as to whether Outlook's potency, unpredictability, and ability to be readily absorbed by broadleaf plant roots render it unreasonably inconvenient or useless as a sweet potato herbicide.

6

## 2. Knowledge of Defect

Dawson cannot recover for defects that were known or should have been known at the time of the sale. Jessup, 482 F.3d at 342. BASF argues that Dawson's redhibition claim must fail simply because Dawson knew that Outlook "[could] cause injury to sweet potatoes." The Court disagrees.

On November 5, 2004, the EPA approved Outlook for use on sweet potato fields in Louisiana. According to Outlook's 2005 label, "[t]he use of Outlook herbicide can cause injury to sweet potatoes . . . The option of applying Outlook for weed control versus crop injury should be based on the potential crop losses due to weed infestations versus potential losses from crop injury." [Doc. No. 121-5 at p. 2]. It is undisputed that George Clint Striplin, the agent of Dawson Farms responsible for selecting Outlook, read the 2005 label.

Although Striplin read Outlook's label, Dawson's redhibition claim is still viable. BASF sought and obtained an EPA-approved label that indicated Outlook could be an effective sweet potato herbicide. Outlook's label did not inform Striplin that the "potential for crop injury" was greater than the usual potential for crop injury associated with chloroacetamides during heavy rain. [Doc. No. 134-8 at p. 2-3]. As discussed above, there is evidence that Outlook is easily absorbed by sweet potatoes and has a potency and unpredictable quality that causes it, even under normal weather conditions, to injure so many sweet potatoes that it is virtually useless as a sweet potato herbicide.

BASF argues that the holding in In re Air Bag Product Liability Litigation 7 F.Supp.2d 792 (E.D. La. 1998), establishes that Outlook's warning sufficiently apprised Dawson about its alleged defects. Air Bag is distinguishable from this case. In Air Bag, it was undisputed that the air bags were effective products. The issue, then, was whether the warnings apprised buyers that

7

their useful product had characteristics that rendered the product unsafe in <u>some</u> circumstances.
The issue in this case is whether the warning apprised buyers that Outlook had characteristics that
allegedly rendered the sweet potato  herbicide unreasonably inconvenient or entirely useless due
to the extent and unpredictability of the damage it caused under normal use.

      Although the label indicates that Outlook had "potential for crop injury," the label did not
indicate that this potential for crop injury was anything more than the usual risks associated with
other sweet potato herbicides. On the contrary, the label arguably indicates that Outlook could
reasonably function as a sweet potato herbicide in Louisiana. The top of Outlook's label stated
"FOR DISTRIBUTION IN LOUISIANA . . . FOR WEED CONTROL IN SWEET POTATO."
[Doc. No. 121-5 at p. 2].

      BASF next argues that Dawson would have discovered that Outlook was defective with a
simple inspection.

      Dawson cannot recover for defects that are apparent, such that they might have been
discovered by simple inspection. <u>Air Bag</u>, 7 F.Supp.2d at 798. Simple inspection connotes more
than casual observation and requires examination with a view of ascertaining the thing's
soundness. <u>Id.</u> (quoting <u>Nesbitt v. Dunn</u>, 28,240, p. 11 (La. App. 2 Cir. 4/3/96); 672 So.2d 226,
234). The ultimate inquiry is "whether a reasonably prudent buyer acting under similar
circumstances would have discovered the . . . problem prior to . . . sale." <u>Id.</u> (quoting <u>Fruge v.
Hancock</u>, 94-730, p. (La. App. 3 Cir. 12/7/94); 647 So.2d 488, 492).

      The label on Outlook warned Dawson that "Outlook should be tested on a portion of the
crop to determine if the use of Outlook is suitable for the intended use." BASF argues that a
reasonable buyer, after following this test, would have discovered that the product was defective.
BASF, however, assumes that a reasonable buyer would necessarily have conducted the

recommended test and that the test would necessarily have revealed Outlook's defects.

In response, Dawson presents evidence that, before Outlook was sold as a sweet potato herbicide, Dawson used Dual, an herbicide in the same chemical family as Outlook, on its sweet potatoes, and that once Outlook was introduced into the sweet potato market, Dual was no longer labeled as a sweet potato herbicide. Thus, Dawson was required to change its herbicide in 2005 and chose to use Outlook. Under the circumstances, a reasonable buyer would not necessarily have tested Outlook.

Second, assuming arguendo that a reasonable buyer would have tested Outlook on its crop, Dawson has presented evidence that the buyer would not have discovered Outlook's defects because it would only have tested Outlook for less than an entire growing season. Because Dawson had to apply a new herbicide to all its crops in 2005, it could only test a herbicide for a brief period before deciding whether to apply it to the entire crop. Dawson has presented evidence that Outlook's defects are usually revealed only after an entire growing season, and that, because sweet potatoes grow underground, farmers cannot observe Outlook's effects as easily as they can aboveground crops. Under these circumstances, a jury could conclude that a reasonable buyer would not have discovered Outlook's defects because the buyer would test Outlook for less than an entire growing season before deciding to apply it to the entire crop.

Finally, even if a reasonable buyer could somehow have tested Outlook for an entire growing season, it would not necessarily have discovered Outlook's defects because it would only have tested Outlook on "a portion of the crop." There is evidence from which a jury could conclude that Outlook does not uniformly affect every portion of a farmer's crop. Indeed, one of Outlook's alleged defects is that farmers cannot reasonably anticipate if, when, and where it might ruin their crops.

9

For these reasons, the Court finds that there is a genuine issue of material fact whether

Dawson knew or should have known that Outlook's qualities made it unreasonably inconvenient

or useless as an herbicide. BASF's motion for summary judgment on Dawson's redhibition claim

is therefore DENIED.

    **B.**    **Breach of Contract Claim/Implied Warranty of Fitness for Ordinary Use**

Dawson argues that BASF breached Article 2524's implied warranty that a product will

be fit for its intended use. [Doc. No. 158-3 at p. 2] ("Regardless of whether the warranty of

fitness arose under Article 2520 or 2524, Outlook was clearly not fit for its ordinary or intended

use."). A buyer's action under Article 2524  is controlled by the rules of conventional

obligations. La. Civ. Code art. 2524 cmt. (b). A buyer can bring an action against a

manufacturer for breach of the implied warranty of fitness, even if there is no privity of contract

between the parties. In re Gas Water Heater Products, 96-2484, 1996 WL 732525, *4 (E.D.La.

Dec. 12, 1996) ("By its text, Article 2524 clearly holds sellers liable. Manufacturers may also be

held liable for breach of the warranty of fitness.") (citing Media Prod. Consultants, Inc. v.

Mercedes Benz of N. America, Inc., 262 So.2d 377, 381 (La. 1972)).

BASF moves for summary judgment on Dawson's Article 2524 claim, arguing that

Outlook was fit for its intended use because it "provided effective weed control with the risk of

an injurious side effect." BASF, however, assumes that an herbicide is fit for its intended use as

long as it simply "provide[s] effective weed control." Thus, under BASF's argument, an

herbicide can be effective no matter how great its risk to crops.

Contrary to BASF's assertions, there is a genuine issue of material fact whether Outlook

was fit for use as a sweet potato herbicide. Although Outlook clearly killed weeds, there is

evidence that it also killed and injured sweet potatoes at such a rate that a fact finder could

conclude it was unfit for use as a sweet potato herbicide.

Thus, Dawson may present its alternative Article 2524 claim to the jury. BASF's Motion for Summary Judgment on Dawson's breach of warranty claim is DENIED.

## C. Design Defect Claim under the LPLA

Dawson also argues that Outlook was unreasonably dangerous in design under the LPLA.[3] La. Rev. Stat. § 9:2800.56. To prevail on this claim, Dawson must first establish that at the time Outlook left BASF's control "[t]here existed an alternative design that was capable of preventing the claimant's damage." La. Rev. Stat. § 9:2800.56(1). Once a party establishes the existence of an alternative design, it must next present evidence such that a jury could conduct a risk-utility analysis. The risk-utility analysis is based on general tort principles and Louisiana Revised Statute § 9:2800.56(2). See Bernard v. Ferrellgas, 96-621 (La. App. 3 Cir.2/5/97); 689 So.2d 554.

Dawson has presented evidence such that a reasonable juror could conclude that Dual herbicide is an herbicide in the same chemical family as Outlook, but has an alternative feasible design that makes it a safer sweet potato herbicide. Dr. Cannon attests that Dual's design controls weeds with an efficiency similar to Outlook, but Dual's design makes it less dangerous to crops. [Doc. No. 134-8 at 3]. BASF's own expert, Dr. William Burdine, Jr., stated in a report to BASF that Dual is not as destructive to crops as Outlook. [Doc. No. 134-4 at p. 4] ("Dual can cause similar root injury but on a much limited basis. Dual injury is not as widespread over a

---

[3] The LPLA provides for several causes of actions, such as failure to warn, breach of express warranty, and design defect. Originally it was unclear which of these theories Dawson was pursuing. Dawson's response to BASF's Motion for Summary Judgment, however, has confirmed that Dawson's sole theory of recovery under the LPLA is a design defect claim under Louisiana Revised Statute § 9:2800.56.

11

host of soil types and moisture conditions as Outlook . . . ."). Another BASF expert, Dr. Shankle,

arguably admits that Dual and Outlook are similar in their ability to control weeds. [Doc. No.

134-5 at p. 11] ("There's a lot of Dual rates and Outlook rates and compared to each other as far

as their weed control capability, and . . . they're similar in that regard."). A reasonable jury could

conclude from this evidence that BASF could have manufactured an herbicide like Dual, an

alternative design that was capable of preventing Dawson's damages.

Notwithstanding this evidence of an alternative design, BASF argues that a jury cannot

conduct the risk-utility analysis because there is insufficient evidence of the burden on it to adopt

the alternative design.

To determine whether a reasonable juror can conduct the risk-utility test, the Court must

consider the risk created by the product, if any, and then determine whether a reasonable juror

could conclude that the danger-in-fact, whether foreseeable or not, outweighs the product's

utility. Krummel v. Bombardier Corp., 206 F.3d 548, 551 (5th Cir. 2000)(citing Bernard v.

Ferrellgas, 96-621 (La. App. 3 Cir.2/5/97); 689 So.2d 554).  For a jury to conduct the risk-utility

analysis, plaintiffs must usually present evidence regarding the burden on the manufacturer of

adopting an alternative design.  Lavespere v. Niagara Machine & Tool Works, Inc., 910 F.2d 167,

183 (5th Cir.1990).  However, plaintiffs need not present such evidence if it has presented

evidence concerning (1) the frequency of accidents like its own and (2) the reduction in

frequency of those accidents that would have followed from the use of its proposed alternative.

Krummel, 206 F.3d at 551 (finding the risk-utility analysis requires a plaintiff to present evidence

"concerning the frequency of accidents like his own, the economic costs entailed by those

accidents, or the extent of the reduction in frequency of those accidents that would have followed

on the use of his proposed alternative design.") (emphasis added) (quoting Lavespere v. Niagara

12

Machine & Tool Works, Inc., 910 F.2d 167, 183 (5th Cir.1990)).

In this case, Dawson has also presented sufficient evidence for a juror to evaluate whether the risk of damage from Outlook outweighs its utility.

First, both Dawson and BASF have estimated the damage Outlook caused to Dawson's sweet potato crop. According to BASF's damage expert, Robert Alexander, Dawson suffered between $816,000.00 and $1,437,000.00 in crop losses. [134-8 at p. 6]. Dawson's expert, Carlton Clark, estimates Dawson's losses between $3,218,000.00 and $4,700,870.00.

Second, Dawson has also presented evidence regarding the frequency of damage from Outlook at other farms and the likelihood that those damages would be reduced with an alternatively designed herbicide. Dr. Cannon's report details interviews with seven of the fourteen sweet potato growers who reported damage from Outlook. [Doc. No. 134-8 at 22-27]. According to his report, Outlook damaged sweet potatoes at several farms in five Louisiana parishes, stretching over 200 miles. [Doc. No. 134-8 at 21]. The report quantifies the percentage of crops that some of these farmers lost from Outlook, and, in a few cases, Dr. Cannon was able to directly compare yields from a field treated with Outlook to the yields in an adjacent field treated by another herbicide. To illustrate, according to Dr. Cannon's report, farmer Terry Devillier treated a field with Outlook and treated an adjacent field with two other herbicides. Both fields, according to the report, were planted about the same time, but the Outlook treated field lost 70% of its crop while the adjacent field had normal yields.

Next, Dawson, as noted before, has presented evidence from which a reasonable jury could conclude that Outlook is virtually useless as a sweet potato herbicide.

Finally, contrary to BASF's assertions, direct evidence about the burden on BASF of adopting the alternative design is not necessary because BASF has stopped marketing Outlook

13

for use on sweet potatoes and Dawson has otherwise presented sufficient evidence for a juror to conduct a risk-utility analysis and conclude that Outlook is unreasonably dangerous. See United Fire Group v. Duro-Last, Inc., 05-1499, 2006 WL 2620206, *4 (E.D. La. Sept. 11, 2006) (finding evidence was sufficient to create a genuine issue of material fact, "[a]lthough plaintiff ha[d] not specifically referenced a safer, alternative design that was available to [defendant] or done a risk-utility analysis.")

For these reasons, the Court find that there is a genuine issue of material fact on Dawson's design defect claim. BASF's motion for Summary Judgment on that claim is DENIED.

## III. CONCLUSION

For the foregoing reasons, BASF's Motion for Summary Judgment [Doc. No. 121] on Dawson's negligence, negligent misrepresentation, and LUTPA claims is GRANTED. BASF's motion for summary judgment on Dawson's redhibition, breach of warranty, and design defect claims is DENIED.

MONROE, LOUISIANA, this ___16___ day of ___May___, 2008.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE